**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

LUCY PLATER,

              *Plaintiff*,

*v*.

COMMISSIONER OF SOCIAL SECURITY,

            *Defendant*.

_____/

CASE NO. 4:17-cv-13022

DISTRICT JUDGE MATTHEW F. LEITMAN

MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 13, 18)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff Lucy Plater is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 13), be **DENIED**, that the Commissioner's Motion, (Doc. 18), be **GRANTED**, and that this case be **AFFIRMED.**

## II.    REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under Title II, 42 U.S.C. § 401 *et seq*. (Doc. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the

undersigned Magistrate Judge. (Doc. 4). The matter is currently before the court on cross-motions for summary judgment. (Docs. 13, 18).

Plaintiff filed for DIB on May 29, 2014, alleging disability beginning May 8, 2014. (Doc. 11 at PageID.47). Her claim was initially denied on October 25, 2014, and upon reconsideration on February 19, 2015. (*Id.*). At Plaintiff's request, an administrative hearing was held on July 21, 2016, before Administrative Law Judge ("ALJ") Henry Perez, Jr. (*Id.* at PageID.66-82). The following month, the ALJ issued a decision denying Plaintiff's claims. (*Id.* at PageID.44-63). In June 2017, the Appeals Council denied Plaintiff's request for review. (*Id.* at PageID.35-39). This action followed.

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets

3

> or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity ["RFC"] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered the claimant unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ concluded that Plaintiff had not been disabled under the Social Security Act from May 8, 2014, through the date of the decision, August 2, 2016. (Doc. 11 at PageID.47). Plaintiff met the insured status requirements of the Social Security Act through December 31, 2018. (*Id.* at PageID.49). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of May 8, 2014. (*Id.* at PageID.49). Next, the ALJ determined that Plaintiff had the following severe impairments: neck strain and lumbago. (*Id.*). Additionally, she had the non-severe impairments of vestibular disorder, hypertension, obesity, and an affective disorder. (*Id.* at PageID.49-53). At step three, the ALJ observed that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.* at PageID.53-54). Next, the ALJ found Plaintiff had the RFC to "perform light work as defined in 20 CFR 404.1567(b) except she can never climb ladders, ropes, or scaffolds; can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and she must avoid concentrated exposure to unprotected heights, moving mechanical parts, and operating a motor vehicle." (*Id.* at PageID.54). Moving to step four, the ALJ found Plaintiff was capable of performing past relevant work as a nail technician. (*Id.* at PageID.57). Thus, the ALJ concluded Plaintiff had not been under a disability from May 8, 2014 through the date of his decision. (*Id.*).

### E.  Administrative Record

#### 1.       Medical Evidence

The Court has thoroughly reviewed Plaintiff's medical record. In lieu of summarizing her medical history here, the Court will make reference and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.       Plaintiff's Function Report

Plaintiff completed a function report on August 1, 2014. (Doc. 11 at PageID.222-229). Plaintiff described how her vestibular disorder made her "dizzy and very nauseous" and caused blurry vision that made focusing difficult. (*Id.* at PageID.222). She had to walk slowly and move slowly. (*Id.*). Further, a car accident had resulted in a head injury and neck and back sprain that "made everything worse"—she found it difficult to "sit, stand, bend[,] move [her] neck[,] reach[, and] lift." (*Id.*). Her neck and back pain also sometimes woke her from sleep at night. (*Id.* at PageID.223).

On an average day, Plaintiff would wake up, take her medication, "take a shower very slow[ly]," "try to do a little housework at a time," check the mail, and "try to walk to the corner store to get some exercise." (*Id.*). She had a dog which she took out in the yard "sometimes" and would walk "a little bit" when she was "feeling up to it." (*Id.*). Before onset, she had been able to walk quickly, run, take lengthy bike rides, walk her dog for forty-five minutes each night after work, drive, go to the gym, and generally "enjoy life." (*Id.*).

She was able to dress and bathe, but "slowly, very slowly." (*Id.*). She had no issue using the toilet. (*Id.*). She did not shave as often as she had previously. *Id.*). She wore a wig because she had alopecia. (*Id.*).

Plaintiff no longer made many "hard" meals, opting instead for "simple sandwiches," "simple meals where I don't have to do much," and "packaged oatmeal." (*Id.* at PageID.223-224). She prepared food daily, and spent about ten minutes doing so. (*Id.* at PageID.224). As for house and yard work, she was able to sweep for about half an hour twice a week, and do laundry for about three hours once a week, both without help. (*Id.*). Her Homeowner's Association mowed her yard. (*Id.*). She indicated that she lived in a house and sometimes friends stayed over to help her. (*Id.* at PageID.222).

Plaintiff tried to go outside "a little each day," whether walking, riding in a car, or using public transportation. (*Id.* at PageID.225). She was able to go out alone. (*Id.*). She did not drive. (*Id.*). About once a week, she went grocery shopping, either by herself and using public transportation, or with someone else's help. (*Id.*). She was also able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*). She recorded reminders about appointments in her phone or calendar. (*Id.* at PageID.224).

She reported that four of her medications caused dizziness: Diazepam, Lisinopril, Bupropion, and Tizanidine. (*Id.* at PageID.229). Her medications sometimes made her doze off. (*Id.* at PageID.223).

Plaintiff concluded her function report with the following:

Since the accident and illness I have lost my joy of life. This living with constant pain and dizzy and nauseous make[s] me very depressed. I used to love being around people and enjoying . . . the outdoors. I cry all the time because of how badly I feel and all the things I can't do anymore. I don't wish this on anyone. I am trying hard to stay positive and I thank God for everything and everyone who is helping me—friends, coworkers, doctors. Some days it's hard to even want to leave my bedroom.

(*Id.* at PageID.229).

### 3.    Plaintiff's Supplemental Pain Questionnaire

Plaintiff also completed a Supplemental Pain Questionnaire on the same date as her function report—August 1, 2014, several months after her car accident of May 8, 2014. (Doc. 11 at PageID.233-235). In her questionnaire, she complained of daily, constant pain in her neck, her middle back, her lower back, and her hip. (*Id.* at PageID.233-234). Her neck pain caused her "severe" headaches, which she rated at a nine out of ten on the pain scale. (*Id.* at PageID.233).

She experienced pain when she walked, bent over, sat, stood, and laid down. (*Id.* at PageID.233, 235). She had to "keep changing position in order to bear the pain." (*Id.* at PageID.233). When she bent her neck, it hurt her "whole back and shoulders," and lifting her arms hurt her neck and back. (*Id.*). A hot bath helped relieve the pain "for a few minutes," and medication helped her sleep "for a little bit." (*Id.* at PageID.234). She did take medication for pain relief, though she also complained that pain medication made her "extremely sick." (*Id.*). She had also seen a chiropractor, but did not think it had helped, and her vestibular disorder made physical therapy difficult. (*Id.*).

Asked how her condition affected her daily activities, Plaintiff reported that she had not been making many meals, and had instead been eating sandwiches and fruits.

(*Id.*). Taking a shower triggered dizzy spells and forced her to move "very slowly." (*Id.*). As for housecleaning, she could do "a little at a time," though "pretty much everything" hurt her neck and back. (*Id.*). She tried to do a small load of laundry once a week. (*Id.*). Her home owners' association cut her grass. (*Id.* at PageID.235). Her only shopping trips were to the grocery store, and usually a friend would drive and help her. (*Id.*).She had not driven since her car accident. (*Id.*). Plaintiff also reported that her pain, depression, and dizziness kept her from doing any social activities or hobbies. (*Id.*).

### 4.        The Administrative Hearing

#### a.  Plaintiff's Testimony

An administrative hearing was held in Plaintiff's case on May 18, 2016, before ALJ Kevin W. Fallis, (Doc. 11 at PageID.66-82), at which Plaintiff testified. (*Id.* at PageID.68-77). Plaintiff testified that she was 46 years old at the time of the hearing. (*Id.* at PageID.68-69). The last grade of school she had completed was ninth grade; she had special vocational training as a nail technician and aesthetician. (*Id.* at PageID.69).

Plaintiff believed she could no longer work because she would get "really dizzy, sick, nauseous," which had caused her to fall before. (*Id.*). Her vision was "very blurry, double vision." (*Id.*). And she found herself "[v]ery fatigued, tired, and just [her] brain kind of turns to mush where it can't think and focus." (*Id.*). These "transient spells" came on without warning and lasted between three and fifteen minutes, "sometimes a few times a day." (*Id.* at PageID.70-71). After, she would feel exhausted and need to lie down and sleep for thirty minutes to several hours, depending on the severity of the spell. (*Id.* at

PageID.71). Her symptoms had caused her to fall the previous month, in June 2015, and injure her right ankle. (*Id.* at PageID.75-76).

Since a car accident on May 8, 2014, her symptoms had worsened; she complained of headaches so severe "[i]t feels like someone is ripping [her] head apart." (*Id.* at PageID.69-70). Her headaches struck at least once a week and could last "a couple hours." (*Id.* at PageID.70). Afterward, she would feel "[m]iserable," like "it [took] every ounce of energy out of [her]," and need to lie down in a dark, quiet place for the rest of the day. (*Id.*). Plaintiff testified she had also been diagnosed with fatigue syndrome, and took naps every day. (*Id.* at PageID.71).

She testified that she had tried "all kinds of different medications" to treat her conditions, including vestibular therapy and "natural [treatments] like acupuncture, chiropractor, just different health food things, you know, ginger, just all kinds of things." (*Id.* at PageID.72). She had been told she had a "low tolerance" for therapy because of her symptoms. (*Id.*).

Plaintiff had also sought treatment from a psychiatrist; she described feeling depressed and overwhelmed by her physical symptoms and inability to work. (*Id.* at PageID.72-73). Further, her concentration and memory were "not that good," which she attributed to her dizziness, headaches, and nausea. (*Id.* at PageID.74).

At the time of the hearing, Plaintiff had lived with her best friend, Lisa, for several years. (*Id.* at PageID.73). Lisa did most of the household chores, including cooking, but Plaintiff would "try to sweep the floor" and "might wash a plate." (*Id.* at PageID.75). When Lisa was not home, Plaintiff could prepare simple meals for herself,

10

such as a sandwich. (*Id.*). She had difficulty showering because it triggered her dizziness and nausea. (*Id.*). Plaintiff had two adult daughters and sometimes spent time with her two grandchildren, ages two and four. (*Id.* at PageID.73-74). Asked what she did in a typical day, Plaintiff said, "Pray that I get better." (*Id.* at PageID.73).

### b.  The Vocational Expert's Testimony

Vocational Expert ("VE") LuAnn Castellana also testified at the administrative hearing. (*Id.* at PageID.77-81). The VE classified Plaintiff as "a younger person," at age 46, with a limited education. (*Id.* at PageID.78). Her past work as a nail technician or manicurist was classified as semiskilled, sedentary work, performed at light; her work as a packager was classified as unskilled, medium work, performed at light; her job as a hi-lo operator was semi-skilled and medium work, with no transferable skills. (*Id.* at PageID.79).

The ALJ posed his first hypothetical:

> Taking claimant's age, education, [and] work experience into account, assume that such a person has an exertional limitation lifting and carrying 20 pounds occasionally, 10 pounds frequently; sitting six hours; standing six hours; walking six hours; pushing and pulling as much as she can lift and carry. Is occasionally climbing ramps and stairs and no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling crouching and crawling; also there is a need to avoid concentrated exposure to unprotected heights, moving mechanical parts, [and] operating a motor vehicle. Putting this individual at the semiskilled level, could such a person be expected to perform claimant's past relevant work?

(*Id.*). The VE responded that the hypothetical person could perform Plaintiff's past work as a nail technician. (*Id.* at PageID.79-80).

Next, the ALJ presented his second hypothetical:

11

> . . . [R]educe[] the exertional limitation, lifting and carrying to ten pounds occasionally and less than ten pounds frequently and she can rarely lift 20 pounds. They're sitting six hours, standing two hours, walking two hours. Will need unscheduled breaks one to two times per day. Pushing and pulling is as much as she can lift and carry. Can rarely climb ramps and stairs, no climbing ladders, ropes, or scaffolds. Stooping and crouching is occasional. And this individual is likely to be absent from work more than four days per month. Putting this individual at the semiskilled level, could such a person be expected to perform claimant's past relevant work?

(*Id.* at PageID.80). No, the VE answered, not with unscheduled breaks and more than four absences per month. (*Id.*). Nor would other full-time jobs be available.

The ALJ then queried whether Plaintiff had testified to any other non-exertional limitations that would prevent her from finding work in the regional or national economy. (*Id.*). The VE referenced Plaintiff's testimony that she experienced transient spells lasting from three to fifteen minutes and then needed to lie down for thirty minutes to two hours, and that she napped every day, explaining that "if that was occurring during an eight-hour shift, obviously that would be preclusive of any competitive work." (*Id.* at PageID.80-81).

Finally, the VE confirmed that her responses had been consistent with the Dictionary of Occupational Titles, except that her testimony as to unscheduled breaks, absences, and the impact of Plaintiff's transient spells had been based on the VE's background and experience in working with employers. (*Id.* at PageID.81).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable

medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527.[1] Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544

---

[1] For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply instead of those in 20 C.F.R. § 404.1527. As Plaintiff's claims were filed on June 12, 2014, (Tr. 23), § 404.1527 governs.

(6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). The ALJ must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540–42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1–2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1–2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

14

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

### G. Analysis

Plaintiff argues the ALJ erred by failing to find that Plaintiff's bipolar disorder, mood disorder, anxiety, and vestibular migraines were severe impairments. (Doc. 13 at PageID.572-574). Further, Plaintiff asserts that the ALJ failed to consider the effects of all of Plaintiff's impairments, severe and non-severe, throughout his review. (*Id.* at PageID.574). Lastly, she argues the ALJ violated the procedural aspect of the treating physician rule in evaluating the medical source opinion from Florida Ear and Balance Center. (*Id.* at PageID.575).

### 1. The ALJ's Failure To Find That Plaintiff's Bipolar Disorder, Mood Disorder, and Anxiety Were Severe Impairments

First, Plaintiff takes issue with the ALJ's failure to classify several of her alleged ailments as severe impairments—namely, bipolar disorder, mood disorder, anxiety, and vestibular migraines. (Doc. 13 at PageID.572). I will address the ALJ's treatment of her vestibular migraines in the next section.

Unfortunately, Plaintiff entirely omits any explanation of why the ALJ should have found bipolar disorder, mood disorder, or anxiety to be severe impairments. None of those three terms appear again in her argument section. She cites no record evidence. And bipolar disorder is not mentioned anywhere in the record—even in Plaintiff's own testimony. Thus, I suggest that Plaintiff has waived any argument as to those alleged impairments. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

The severity requirement—codified at 20 C.F.R. §§ 404.1520 and 404.1521— remains a "*de minimis* hurdle in the disability determination process," useful in discarding claims "obviously lacking in medical merit." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). In accordance with these regulations, however, an ALJ must "continue with the remaining steps" in the disability determination when she determines that some impairments qualify as severe, and others nonsevere. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). For this reason, the "fact that some of [a claimant's] impairments were not deemed to be severe at step two is . . . legally irrelevant" when the ALJ considers both "severe and nonsevere impairments in

the remaining steps of the sequential analysis." *Anthony v. Astsrue*, 266 F. App'x 451, 457 (6th Cir. 2008).

Further, the ALJ thoroughly discussed the reasons for finding Plaintiff's affective disorder non-severe. He noted that although Plaintiff was "assessed with depression or anxiety symptoms" and prescribed an antidepressant, she frequently denied any mental health symptoms and had an appropriate affect and demeanor during treating appointments. (Doc. 11 at PageID.52) (citing (PageID.316) (reporting no anxiety/panic or depression)); (*Id.* at PageID.370, 372, 375, 377) (appropriate affect and demeanor, grossly normal memory); (*Id.* at PageID.371, 376) (negative for anxiety, depression, feelings of stress, mood swings, personality change, difficulty concentrating, sleep disturbance, and suicidal thoughts); (*Id.* at PageID.428) (no depression, but reports anxiety)). She had briefly attended therapy, where she sometimes reported difficulties with mood, but did not show "significant signs or symptoms suggesting greater dysfunction . . . , such as concentration problems, a constricted affect, easy distraction, or psychomotor abnormality." (*Id.* at PageID.52) (citing *id.* at PageID.551-560). The ALJ proceeded to consider the "paragraph B" criteria set out in the disability regulations for evaluation mental disorders. He observed that Plaintiff had not described any limitations in her activities of daily living caused by mental impairment, (*id.* at PageID.52) (citing *id.* at PageID.222-232), had no difficulty getting along with others, (*id.* at PageID.52) (citing *id.* at PageID.226-228), and had not had any extended episodes of decompensation. (*Id.* at PageID.53). He found her to have "mild limitation" in the area of concentration, persistence, or pace, as claimant had alleged she was forgetful and had difficulty

17

concentrating, but medical evidence indicating her attention and concentration were intact. (*Id.*) (citing *id.* at PageID.227, 538).

Further, Plaintiff has not challenged the ALJ's assessment of little weight to the mental RFC assessment from Dr. Madhumalti Bhausar, and great weight to the state agency psychological consultants who found Plaintiff did not have a severe mental impairment. (*Id.* at PageID.53).

In conclusion, I suggest that the ALJ did not err in failing to determine that bipolar disorder, mood disorder, or anxiety were severe impairments.

### 2.     The ALJ's Treatment of Plaintiff's Vestibular Migraines

Plaintiff raises two complaints about the ALJ's treatment of her vestibular migraines, and the two are appropriately considered together. First, she argues that the ALJ erred in not finding her vestibular migraines to be a severe impairment; second, she asserts that the ALJ failed to consider the effects of her vestibular migraines throughout his analysis. (Doc. 13 at PageID.575). Specifically, she states she "would be limited in concentration, persistence, and pace due to the dizziness, nausea, and gait disturbance." (*Id.*).

Contrary to Plaintiff's assertion, the ALJ cites to 20 CFR 404.1423 and offers the reassurance that "[e]ven though the above impairments"—vestibular dysfunction, hypertension, obesity, and affective disorder—"are not 'severe,' all of Claimant's medically determinable impairments have been considered at the remaining steps of the sequential evaluation." (Doc. 11 at PageID.49-53).

Even more telling is the ALJ's explicit explanation that

18

> [a]lthough her vestibular dysfunction does not rise to the level of a severe impairment and she had normal Dix-Hallpike testing, I find it reasonable to limit her to only occasional balancing. Considering her difficulty with vestibular symptoms, her pain, and the effects of her medication in general, she should never climb ladders, ropes, or scaffolds and must avoid concentrated exposure to unprotected heights, moving mechanical parts, and operating a motor vehicle due to distraction and difficulty with balance.

(*Id.* at PageID.56).

Because the ALJ properly considered Plaintiff's severe *and* non-severe impairments throughout his analysis, it is immaterial that he found Plaintiff's vestibular migraines non-severe. *See Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (holding that because the ALJ found the claimant had a severe impairment at Step Two, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence").

Further, though Plaintiff is apparently dissatisfied with the extent of the limitations that the ALJ imposed to account for Plaintiff's vestibular migraines, the ALJ thoroughly explained his reasoning. The ALJ noted earlier in his opinion that "[w]hile Claimant's physicians indicated she had symptoms of a vestibular dysfunction, her physical examinations were largely within normal limits." (Doc. 11 at PageID.50). As the ALJ observed, the record revealed repeated instances in which Plaintiff had no nystagmus, (*id.* at PageID.281, 282, 292, 350, 486), and negative Dix Hallpike tests, (*id.* at PageID.291, 299, 319, 350, 486). Plaintiff at times even denied vertigo. (*Id.* at Page ID.291, PageID.299). An audiogram revealed normal hearing thresholds in both ears. (*Id.* at PageID.287, 318). A CT scan of her head proved unremarkable. (*Id.* at PageID.287, 327).

19

Although at times Plaintiff alleged blurred vision, an eye doctor found no vision abnormalities. (*Id.* at PageID.305). She has denied blurry vision, and only infrequently alleged any difficulty with headache or other visual symptoms. (*Id.* at PageID.425, 428). At one point, she also denied dizziness. (*Id.* at PageID.534).

Plaintiff showed improvement with physical therapy; she attended from March to May 2013 and was discharged after meeting all goals. (*Id.* at PageID.299-300), About a year later, on March 7, 2014, Plaintiff again began seeking treatment for episodic dizziness. Her otolargyngologist indicated a "probable vestibular disorder," but once again her testing was largely within normal limits. (*Id.* at PageID.319). The ALJ acknowledged that testing in April 2014 found Plaintiff had a hypersensitive right ear and mild nystagmus in the left ear down and body lateral right positions. (*Id.* at PageID.352, 354). But in June 2014, vestibular ocular reflex testing, Dix Hallpike test, and nystagmus testing were all negative, and the results of an audiogram were normal. (*Id.* at PageID.318, 350). By July 2014, Plaintiff reported she had improved and was doing well. (*Id.* at PageID.359).

At her consultative medical examination in October 2014, Plaintiff reported her vertigo was constant and worsened by certain movements, (*Id.* at PageID.386), but just one week later she reported she had improved with rehabilitation despite some lingering imbalance, (*Id.* at PageID.368).

No physician has ever recommended Plaintiff use an assistive device for balance, and she has been able to ambulate independently. *See* (*id.* at PageID.305) ("ambulation with symmetrical step length and good cadence without use of an assistive device"); (*id.*

20

at PageID.370, 372, 375, 377, 380, 383, 452, 454) (normal gait); (*id.* at Page.291) (Plaintiff independent with all functional mobility and ambulation without loss of balance or use of an assistive device). And "[w]hile Claimant has alleged falling, only one fall is documented in the record, and she did not report frequent falls to any treating provider." (*Id.* at PageID.477). Further, the ALJ observed that "[d]espite her allegations of difficulty with thinking, concentration, or other cognitive functioning, her medical records show grossly normal memory and good attention and concentration." (*Id.* at PageID.51) (citing *id.* at PageID.452, 538).

For all the above reasons, I suggest the ALJ did not err in his treatment of Plaintiff's vestibular migraine, and that substantial evidence supports his RFC determination.

### 3.     Whether the ALJ Violated the Treating Physician Rule

Lastly, Plaintiff alleges that the ALJ erred in his application of the treating physician rule to the opinions from the Florida Ear and Balance Center. (Doc. 13 at PageID.576). Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence and

is inconsistent with the medical record. *Revels v. Sec'y of Health & Human Servs.*, 882 F.

Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at

*1 (6th Cir. 1995).

The ALJ first addressed the paperwork from Plaintiff's treating physician at

Florida Ear and Balance Center that suggested her dizziness prevented her from working.

(Doc. 11 at PageID.51) (citing *id.* at PageID.438-447). He noted that Plaintiff's physician

expected she would be able to return to work on a part-time basis after a short break. (*Id.*

at PageID.51) (citing *id.* at PageID.440). "Her physician alleged that when dizzy, she is

not able to do the fine motor work required by her job and he alleged Claimant would be

absent once or twice per week for episodes." (*Id.* at PageID.51) (citing *id.* at

PageID.446). He also indicated, however, that it depended on how often Claimant was

able to take a new medication and how she responded to treatment by her neurologist.

(*Id.* at PageID.51) (citing *id.* at PageID.447). Further, he noted treating Claimant on only

three dates, which the ALJ remarked "does not suggest the frequency of disabling

symptoms alleged." (*Id.* at PageID.51) (citing *id.* at PageID.446). Moreover, no difficulty

with fine movement was noted in Plaintiff's treating records and the neurologist that

Plaintiff saw noted her fine coordinated movements were performed well bilaterally with

no tremor noted. (*Id.* at PageID.51) (citing *id.* at PageID.538).

Second, the ALJ discussed additional forms from Florida Ear and Balance Center.

(*Id.* at PageID.51) (citing *id.* at PageID.546-550). He gave those forms no weight due to

the lack of supporting evidence in the record. (*Id.* at PageID.51). In those forms,

"Claimant's physician indicated she would be off task because of symptoms interfering

22

with attention and concentration 20 percent of the day, but . . . her attention and concentration were described as good and this conclusion is not supported." (*Id.* at PageID.51). The ALJ also dismissed the physician's opinions that Plaintiff could sit only 4 hours and stand/walk less than 2 hours in an 8-hour work day, would need unscheduled breaks, and would be absent four or more days per month, citing Plaintiff's "normal Dix-Hallpike testing, absence of any recommendation for an assistive device for balance, and relatively infrequent treatment." (*Id.*).

Plaintiff provides only two sentences of actual argument on this issue: "Surely, such an explanation for assigning little weight cannot constitute the 'good reasons' contemplated by SSR 96-2p considering it ignores the substantial amount of evidence to the contrary. (Tr. 599, 625). Additionally, the ALJ neglects to properly consider the extent that Dr. Florida Ear and Balance Center [sic] was fully involved in the longitudinal picture of Plaintiff's care." (Doc. 13 at PageID.577).

Although Plaintiff cites transcript pages 599 and 625 as a "substantial amount of evidence" running contrary to the ALJ's opinion, it is unclear what evidence he wished the Court to consider, as the transcript only runs through transcript page 520 (alternatively paginated as PageID.560). It seems unlikely that Plaintiff intended instead to cite PageID.599, as that page falls midway through Defendants' motion for summary judgment, and PageID.625 does not exist at all. Further, Plaintiff offers no citation whatsoever to explain the "extent that [the source] was fully involved in the longitudinal picture of Plaintiff's care." (Doc. 13 at PageID.577). In sum, Plaintiff's argument on this

23

point is so thin as to be nonexistent, and I suggest the Court could properly consider it waived. *McPherson*, 125 F.3d at 995–96.

Regardless, the ALJ appropriately explained that he assigned no weight to the above opinions because they lacked supporting objective medical evidence and were inconsistent with the medical record. *See Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995) (ALJ may reject treating source opinion not supported by significant objective medical evidence and inconsistent with medical history). Thus, I suggest the ALJ did not err in his treatment of the opinions from Florida Ear and Balance Center.

### H. Conclusion

For the above reasons, I suggest substantial evidence supports the ALJ's findings and recommend the court **DENY** Plaintiff's Motion for Summary Judgment, (Doc. 13), **GRANT** Defendant's Motion for Summary Judgment, (Doc. 18), and **AFFIRM** this case.

## III.   **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991);

24

*United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 12, 2018                                  S/ PATRICIA T. MORRIS
                                                      Patricia T. Morris
                                                      United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 12, 2018                                  By s/Kristen Castaneda
                                                      Case Manager